UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PARAMOUNT PICTURES CORPORATION

               Plaintiff and Counter-
               Defendant,

               v.

ANTHONY PUZO, AS EXECUTOR OF THE
ESTATE OF MARIO PUZO

               Defendant and Counter-
               Claimant.

No. 12 Civ. 1268 (AJN)

ECF CASE

**ORAL ARGUMENT REQUESTED**

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PARAMOUNT PICTURES
CORPORATION TO DISMISS AMENDED AND RESTATED COUNTERCLAIM**

## I.    <u>PRELIMINARY STATEMENT</u>

This motion is brought pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the amended

counterclaims alleged by Defendant and Counter-Claimant Anthony Puzo, as Executor of the

Estate of Mario Puzo (the "Puzo Estate" or "Estate").

The action concerns a 1969 Agreement between Plaintiff and Counter-Defendant

Paramount Pictures Corporation ("Paramount") and the late author Mario Puzo ("Puzo"),

concerning the well-known novel *The Godfather*.  In 1969, Paramount purchased from Puzo all

rights and copyright interests in *The Godfather*, including all "literary" rights and all rights to use

any of the characters created in *The Godfather* in "other works." The only right reserved to the

Puzo Estate was the right to publish the original novel *The Godfather* and to publish "versions

and adaptations thereof" and "to vend copies thereof."  After entering into this 1969 Agreement,

Paramount adapted the novel *The Godfather* into three famous films, and the characters and story

of the novel and films have become iconic throughout the world for approximately 40 years.

During the production of the sequel films to *The Godfather,* Puzo wrote additional

screenplays and a treatment related to *The Godfather* for Paramount as works-for-hire, and,

without in any way altering the original agreement as to the *Godfather* rights, Paramount granted

him publication rights in those screenplays, while expressly retaining the motion picture and

allied rights.  Puzo died in 1999.  In 2002, his Estate requested that Paramount permit the

publication of a sequel novel.  Paramount consented to the publication of a single sequel novel,

again expressly reserving motion picture and allied rights.  The Puzo Estate then commissioned

two additional sequel novels, and licensed them for publication in 2006 and 2012.  The Estate

failed to obtain Paramount's authorization for either the second or third sequel novels.

Paramount alleges in this action that the unauthorized second and third sequel novels infringe on

the literary rights purchased by Paramount in 1969, and that the cover art on the books also infringes on Paramount's trademarks.

The Estate disagrees, counterclaimed, voluntarily withdrew its initial counterclaim in light of a motion to dismiss, and has now filed a "First Amended and Restated Counterclaim" (the "Counterclaim").  The Counterclaim alleges that Paramount breached the 1969 Agreement in three ways, all of which stem directly from Paramount's assertion of its rights under the 1969 Agreement.  First, the Estate claims, Paramount's assertion that it controlled rights to sequel novels under the 1969 Agreement, including by filing this action, breached the Agreement. (Counterclaim ¶ 13(a)).  Second, the Counterclaim alleges that Paramount breached the Agreement by advising the Estate's publishers  of Paramount's alleged rights under the 1969 Agreement, and by entering into an agreement with the Puzo Estate to escrow funds received by the Estate from the publishers of the third sequel novel pending the outcome of this litigation (the "Interim Settlement Agreement").  (Counterclaim ¶ 13(b)).  Third, the Counterclaim alleges that Paramount's assertion  that it possesses motion picture rights in the unauthorized sequel novels constituted a separate breach.  (Counterclaim ¶ 13(c)).  Based on these allegations, the Estate brought counterclaims for declaratory judgment of "cancellation" and for rescission, and a counterclaim for breach of contract.  Counterclaim ¶¶ 16-24.  In addition, the Counterclaim alleges tortious interference with contract, based on the allegation that Paramount  informed the publishers of the third sequel novel of Paramount's alleged rights under the 1969 Agreement, and agreed to escrow the funds from that novel.  Counterclaim ¶¶ 25-29.

These Counterclaims are fatally flawed.

***First and Second Counterclaims Insufficiently Pled.***   The Puzo Estate's pleading is, on its face, insufficient to support cancellation or rescission (which, under governing New York

law, are interchangeable words for the same thing) of the 1969 Agreement or other related contracts.  Under clear New York law, a cause of action for cancellation or rescission is only available in the event of a "substantial and fundamental" breach that "may be said to go to the root of the agreement between the parties."  *Septembertide Publ'g, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir.1989). Unsurprisingly, there is no basis in law for terminating and canceling an agreement that has been in place for over 40 years, during which Paramount has created a world-famous literary and film franchise in reliance on the agreement, merely because Paramount has asserted its theory of its rights under the 1969 Agreement in this litigation and elsewhere.  While the Counterclaim uses the conclusory phrase "willful and material breach and repudiation" in its allegations, these legal conclusions are unsupported by the relevant factual allegations, which are contained in Paragraph 13 of the Counterclaim.  The allegations of Paragraph 13 cannot suffice to support a claim for an entire cancellation or rescission of the 1969 Agreement.  Moreover, rescission is available only when it is reasonably possible to restore the parties to the condition they were in before a contract was entered into.  Given the more than 40 years since the 1969 Agreement was entered into, the subsequent development, production and distribution  of the *Godfather* films and ancillary exploitation of the *Godfather* franchise, it is clear on the face of the Estate's pleadings that this element of a rescission claim is not met.

*All Counterclaims Are Subject to Copyright Preemption.*  Second, all of the counterclaims are preempted by the Copyright Act.  As this Court held less than one month ago, Section 301 of the Copyright Act preempts claims that are within the "general scope" of the Copyright Act.  *WNET v. Aereo, Inc.*, 12 CIV. 1543 AJN, 2012 WL 1850911 (S.D.N.Y. May 18, 2012).  Here, the Estate claims that it, and not Paramount, holds the right under the Copyright Act to publish the sequel novels.  Its counterclaims all follow directly from Paramount's

assertion of Paramount's own rights under the Copyright Act, which the Estate has alleged is erroneous.  A claim for breach of contract that merely asserts that a breach has occurred through another party's violation of its copyright interests is preempted by the federal copyright laws. *Am. Movie Classics Co. v. Turner Entm't Co*., 922 F. Supp. 926, 931-32 (S.D.N.Y. 1996). Similarly, a claim for rescission is preempted by the Copyright Act where the rescission is based upon conduct in violation of a copyright interest.  *Santa-Rosa v. Combo Records*, 471 F.3d 224, 227 (1st Cir. 2006).  Finally, the tortious interference claim is preempted, because it is nothing more than a claim that Paramount interfered with the Puzo Estate's exercise and enjoyment of its alleged copyright interest.  *Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 201 (2d Cir. 1983) (*overruled on other grounds by Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985)).

***Fourth Counterclaim Barred by Interim Settlement Agreement.***  In addition, the tortious interference claim fails because it is barred by the interim settlement agreement entered into by the parties to this action.  The alleged "interference" is based upon an agreement  (the "Interim Settlement Agreement") between Paramount and the Puzo Estate to escrow funds received from the publishers of the third sequel novel pending this litigation. Counterclaim ¶ 27. However, the Interim Settlement Agreement specifically provides that its terms—that is, the escrowing of publishers' funds—would  not "affect any of the rights, remedies or claims of any party."  Having unambiguously agreed that the Interim Settlement Agreement would *not* affect its claims, the Puzo Estate cannot now bring a new Counterclaim based upon the escrow provisions of the Interim Settlement Agreement.  To the extent that anything is left of the tortious interference claim aside from the Interim Settlement Agreement, it is merely Paramount's assertion of its legal rights to the publishers following its filing of this action, and

Second Circuit precedent holds that the mere assertion of a party's legal rights cannot validly serve as the basis for a tortious interference claim.

Accordingly, the Court should dismiss the Estate's Counterclaims.

## II.    STATEMENT OF ALLEGED FACTS

As appropriate on a Rule 12(b)(6) motion, the following Statement of Facts is based upon the Puzo Estate's pleadings in the matter, namely its answer to Paramount's First Amended Complaint ("Answer," Docket No 21) and First Amended and Supplemented Counterclaim ("Counterclaim," Docket No. 21).  In addition, the Court should also consider the attached September 1969 Agreement (the "Agreement") and November 1969 copyright grant (the "Grant") between Puzo and Paramount (collectively, the "1969 Agreements"), which are incorporated by reference in the First Amended Complaint and Answer and Counterclaims and are attached as Exhibits A and B to the supporting Declaration of Nicholas F. Daum.  The Court should also consider the Interim Settlement Agreement entered into as of March 22, 2012, between Paramount and the Puzo Estate, attached as Exhibit C to the Daum Declaration, and the writers' agreements between Puzo and Paramount attached as Exhibit D to the Daum Declaration.  *See Brass v. Amer. Film Techn., Inc.,* 987 F.2d 142, 150 (2d Cir.1993) ("While a Rule 12 motion is directed only to the sufficiency of the pleading, the court determining the motion may rightfully consider written documents attached to the complaint as well as documents incorporated thereto by reference and those of which plaintiff had knowledge and relied upon in commencing her lawsuit.").

In 1967, Paramount and Puzo entered into an option agreement, under which Paramount acquired the option to purchase copyright interests in Puzo's novel *The Godfather*.  Counterclaim ¶ 1.  In September, 1969, Puzo and Paramount entered into a contract under which Puzo agreed

to grant to Paramount "any and all copyrights [in *The Godfather*] and all rights now known or hereafter accruing therein and thereto, forever and throughout the world, together with the sole and exclusive right to use said work, in whole or in part, in whatever manner the Purchaser [i.e., Paramount] may desire, including, but not limited to, the sole and exclusive right: *to make and cause to be made literary and dramatic and other versions and adaptations of every kind and character of said work or any part or parts thereof* and/or any or all of the characters created therein . . . [and] to adapt, arrange, change, interpolate in, transpose, add to and subtract from said work to such extent as the Purchaser, in its sole discretion, may desire in connection with any use which the Purchaser may make of said work."  Counterclaim ¶ 2; Agreement at p. 2, ¶ Second (emphasis added).  The Agreement also granted Paramount the sole and exclusive right to "*use any or all of the characters created therein and said titles or any simulations thereof in connection with any other works, whether or not the same are based upon or adapted from said work or any part or parts thereof.*"  *Id.* (emphasis added).

 These rights were granted in exchange for a cash payment, and bonus payments based upon the sales of the novel.  Counterclaim ¶ 2; Agreement at p. 4.  The Agreement acknowledged that *The Godfather* had already been published in the United States on March 10, 1969, by the publishing house G.P. Putnam and Sons.  Agreement at p. 1.  In the list of rights granted to Paramount under the Agreement, the words "to publish said work and/or any versions or adaptations thereof, or any part or parts thereof, and to vend copies thereof" were stricken.  Counterclaim at ¶ 2; Agreement at p. 2.

In November, 1969, consistent with the Agreement, Puzo restated its grant of all rights and copyright interests of any kind in *The Godfather* to Paramount, again expressly including

"literary" rights, including the right to "use any or all of the characters created therein . . . in connection with any other works."  Grant at p. 1.

Following the grants made in the September and November 1969 Agreements, Paramount made three world-famous films based upon *The Godfather*, directed by Francis Ford Coppola.  Answer at ¶ 3; First Amended Complaint at ¶ 4; Counterclaim at ¶ 7.   In connection with those films, Puzo wrote screenplays for Paramount as works-for-hire, and Paramount allowed Puzo the right to publish novelizations of those screenplays, while maintaining all motion picture and related rights in the screenplays and novelizations.  Counterclaim at ¶ 5; Daum Decl. at Ex. D.

In 2002, following the death of Mario Puzo, representatives of the Puzo Estate informed Paramount that they were interested in creating a sequel novel to *The Godfather*, to be written by a new author, and in licensing said novel for publication.   Answer at ¶¶ 4-5; First Amended Complaint at ¶¶ 5-6; Counterclaim ¶ 9.  Paramount and the Puzo Estate then entered into an agreement authorizing the publication of one, and only one, sequel novel, which eventually would be entitled *The Godfather Returns*.   That agreement specified that Paramount is "the owner of all motion picture, television and allied rights in and to the Novel and the Sequel Novel."  *Id.*

Subsequently, without Paramount's authorization, the Estate engaged authors to create two additional sequel novels.  Counterclaim ¶¶ 10-11.  The second sequel, entitled *The Godfather's Revenge*, was published in 2006 without Paramount's knowledge or consent.  A third sequel novel, entitled *The Family Corleone*, has recently been written, and is scheduled for publication in 2012.   Answer at ¶¶ 6-7; First Amended Complaint at ¶¶ 7-8; Counterclaim ¶

11.[1]  The Puzo Estate has already entered into agreements with U.S. and foreign publishers concerning *The Family Corleone*.  Counterclaim ¶ 11.  The Puzo Estate acknowledges that Paramount holds motion picture rights to characters in the original novel *The Godfather* and in the trilogy of films, but contends that, notwithstanding the language of the Agreement and Grant, Paramount has no motion picture rights to characters or situations developed for the first time in the sequel novels.  Answer at ¶ 8; Counterclaim ¶ 13.

On February 17, 2012, Paramount brought the instant action against the Puzo Estate, for Copyright and Trademark Infringement, claiming that the two unauthorized sequel novels, *The Godfather's Revenge* and *The Family Corleone*, infringe Paramount's rights as set forth the 1969 Agreements, and that the Puzo Estate's use of Paramount's *Godfather* trademarks constitute trademark infringement and false designation of origin, and seeking declaratory relief.  Docket No. 1.  On March 12, 2012, the Puzo Estate filed an Answer and Counterclaim.  Docket No. 4. Paramount filed a First Amended Complaint on April 2, 2012.  Docket No. 8.  On April 11, 2012, the Puzo Estate answered the complaint and brought a counterclaim, alleging three claims against Paramount: for cancellation and termination, for breach of contract, and for tortious interference, and Paramount moved to dismiss that counterclaim  Docket Nos. 9 and 10.

In the meantime, the parties negotiated a partial settlement agreement (the "Interim Settlement Agreement") under which, in exchange for Paramount's agreement to refrain from seeking injunctive relief to prevent the publication of *The Family Corleone*, the Puzo Estate agreed to escrow the funds it received from the publishers of *The Family Corleone*.  Daum Decl. Ex. C.  As part of that Interim Settlement Agreement, the parties explicitly agreed that "Except

---

[1] Although not pleaded in the Answer and Counterclaim, it is undisputed that *The Family Corleone* was in fact published on May 8, 2012, approximately one month after Paramount filed and served the First Amended Complaint.

for the matters expressly agreed to herein, this Interim Agreement shall not waive or affect any of the rights, remedies, or claims of any Party (including, *inter alia*, claims for damages, declaratory relief, cancellation, and termination)."  Daum Decl. Ex. C at ¶ 2.6.

Following receipt of Paramount's motion to dismiss, the Puzo Estate announced that it would amend its Counterclaim, and subsequently filed the Amended and Restated Counterclaim that is the subject of the instant motion.  Docket No. 21.  The Amended and Restated Counterclaim contains four separate counterclaims, including alternative counterclaims for a declaratory judgment of cancellation and rescission, a claim for breach of contract, and a claim for tortious interference with contract.  The facts underlying each of these claims are Paramount's purported material breach of the 1969 Agreement by asserting its rights in this litigation and elsewhere, including to the publishers of *The Family Corleone*.  Counterclaim ¶ 13.  Several of the counterclaims are expressly based upon the Interim Settlement Agreement, despite the express undertaking of the Puzo Estate to refrain from using the Interim Settlement Agreement to assert claims.  Counterclaim ¶ 13, 25-28.

## III.   STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a pleading must do more than merely raise the possibility that some set of facts might support recovery; it must set forth factual allegations that "raise a right to relief above a speculative level," and "a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citations omitted).  Thus, "only a [pleading] that states a plausible claim for relief survives a motion to dismiss."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  To show plausibility, a pleading must contain sufficient

factual matter, accepted as true, to both "state a claim to relief that is plausible on its face" and allow a court to draw a reasonable inference that the defendant is liable. *Id.* at 678.

## IV.   ARGUMENT

### A.   The Cancellation and Rescission Counterclaims Fail

#### 1.   There Can Be No Rescission or Cancellation Because, on the Face of the Pleadings, the Alleged Breach Is Not Sufficiently Material, Substantial, and Fundamental to Cancel the Contractual Rights

The First Counterclaim seeks a prospective "cancellation" of the 1969 Agreement, and the Second Counterclaim, plead in the alternative, seeks rescission of contract.  However, neither cancellation nor rescission is appropriate.  The only alleged breach of contract giving rise to the claimed right of cancellation or rescission is Paramount's mere *assertion* of its copyright interests, which is insufficient as a matter of law to justify rescinding or cancelling the 1969 Agreement.

Under governing New York law, rescission and cancellation are the same remedy. *Ogunsanya v. Langmuir*, 08-CV-940 (JG), 2008 WL 4426590 (E.D.N.Y. Sept. 26, 2008) ("The remedy of 'cancellation' is the . . . equivalent of rescission") citing *Aetna Cas. & Sur. Co. v. O'Connor*, 8 A.D.2d 530, 190 N.Y.S.2d 795, 800 (2d Dep't 1959) ("According not only to dictionary definitions but also to accepted usage in the legal profession, the words 'cancellation' and 'rescission' are frequently regarded as interchangeable.").  However, to accomplish a rescission or cancellation of contract, it is not enough that a party merely allege and prove a breach of contract.  Rather, rescission is an extraordinary remedy, and to be available, the breach must go to the fundamental objects of the parties in making the contract. *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir.1980) ("Rescission is an extraordinary remedy, appropriate only

where the breach is found to be material and willful, or if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.") (quotations omitted); *Septembertide Publ'g, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir.1989) ("As an extraordinary remedy, rescission is appropriate only when a breach may be said to go to the root of the agreement between the parties.") (quotation marks omitted); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir.1976); *Babylon Assocs. v. County of Suffolk*, 101 A.D.2d 207, 215, 475 N.Y.S.2d 869, 874 (2d Dep't 1984); *Maldonado v. Valsyn, S.A.*, 06 CIV. 15290 (RMB), 2009 WL 3094888 (S.D.N.Y. Sept. 23, 2009)...   Where, on the face of the Complaint, the alleged breach is obviously not sufficiently material to provide for a rescission, a claim for rescission may be dismissed as a matter of law.  *Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 362 (S.D.N.Y. 1998); *Faden Bayes Corp. v. Ford Motor Co.*, 97 CIV. 1867 (MBM), 1997 WL 426100 (S.D.N.Y. July 30, 1997) (dismissing claim for rescission where alleged breach plainly not material, substantial, and fundamental given overall contract).

Here, while the Puzo estate perfunctorily alleges material breach, there are simply no allegations sufficient to support a conclusion that the purported breach was sufficiently substantial, fundamental, and material to support rescission or cancellation.  The only claimed breach is, in its entirety, contained within Paragraph 13 of the Counterclaim.  In that Paragraph, the Puzo Estate makes three, and only three allegations of material breach: that Paramount (a) has breached the contract by asserting, in this litigation and elsewhere, that the Puzo Estate has no right to publish *Godfather* sequel novels; (b) that Paramount has informed publishers of the Third Sequel Novel of Paramount's assertions under the 1969 Agreement, and has entered into the Interim Settlement Agreement, and (c) that Paramount has asserted that, under the 1969

Agreement, it possesses motion picture rights in the sequel novels.  Counterclaim ¶ 13.  In short, the only alleged breach stems from Paramount's assertion of its copyright interests  under the 1969 Agreement in this action and otherwise; no other breach is alleged.  However, this is plainly an insufficient allegation to support a claim of substantial, fundamental, and material breach or a claim for rescission based thereon.

First, the Puzo Estate's conclusory allegations do not establish that Paramount has "repudiated" the contract in a manner sufficient to give rise to a substantial, fundamental, and material breach and permit a rescission.  Under New York law, repudiation of a contractual obligation occurs by "either [i] 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or [ii] 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach .'" *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463, 682 N.Y.S.2d 664, 705 N.E.2d 656 (1998) (quoting Restatement (Second) of Contracts § 250 (1981)); *see also  RT Computer Graphics, Inc. v. United States,* 44 Fed. Cl. 747, 759 (Fed. Cl. 1999) (internal quotations omitted) ( "[t]he renunciation...must rise to the level of a clear and unqualified refusal to perform the entire contract.");  *Palazzetti Import/Export, Inc. v. Morson*, No. 98 Civ. 722, 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6, 2001); *Lovasz v. Fowler*, 211 A.D. 860, 207 N.Y.S. 871 (1924) (rescission appropriate only where there is "the absolute, unequivocal repudiation that is required by law to warrant the defendant in treating the contract as at an end").  Here, far from unequivocally repudiating the Agreement and treating it as at an end, Paramount has *affirmed* the Agreement and the grant of rights therein, and has brought an action against the Puzo Estate for copyright infringement on the basis of that Agreement.  Even if the Estate's contract interpretation differs from

Paramount's, Paramount's copyright claim plainly springs from an attempt to enforce copyrights granted under the Agreement, not to repudiate it.

Second, what the Puzo Estate characterizes as the alleged breach is no breach at all, because no provision of the Agreement bars the bringing of an action, or an assertion of rights, based on copyright infringement, or an assertion of the same to publishers.  There is no clause of the Agreement that even suggests that a mere assertion of rights suffices to void the Agreement, retroactively or prospectively.  The absence of a covenant not to sue or a rescission or reversion clause makes clear that the mere assertion of a claim by Paramount cannot suffice to rescind the entire Agreement. *Maldonado*, 2009 WL 3094888 at *4; citing *In re Stein and Day Inc.,* 80 B.R. 297, 301 n. 1 (Bkrtcy.S.D.N.Y.1987); *Arthur Guinness & Sons, PLC v. Sterling Publishing Co.*, 732 F.2d 1095, 1101 (2d Cir.1984); *Ariel (UK) Ltd. v. Reuters Group PLC*, 05 CIV. 9646 (JFK), 2006 WL 3161467 (S.D.N.Y. Oct. 31, 2006) ("The absence of a rescission or reversion clause . . . is a factor that weighs against rescission.").

Finally, as a matter of law, the mere assertion of copyright interests arising from the 1969 Agreement cannot be sufficiently substantial, fundamental, and  material to give rise to a rescission.  Paramount has not denied the Puzo Estate any benefit whatsoever under the 1969 Agreement; it has merely sought clarification and enforcement of its legal rights in a court of law.  Even accepting the allegations of Paragraph 14 of the Counterclaim, which asserts that publication rights were of "fundamental and critical importance to Puzo as a novelist," for purposes of this motion, it is simply not true that Paramount's mere *assertion* of its copyrights by bringing this action and otherwise can be sufficient to materially breach the contract sufficiently to provoke a rescission.  If Paramount is correct in its assertions, its rights will be enforced and there will have been no breach; if Paramount is incorrect, the Puzo Estate will be entitled to its

rights in the sequel novels.  No contract performance whatsoever has been withheld from the Puzo Estate, and it is clear from the face of the pleadings that the vast bulk of performance under the Agreement – the transfer of rights to Paramount, the payment to Puzo, the creation of the *Godfather* films, and the authorized publication of the first *Godfather* novel, was completed more than 40 years ago.  For this reason alone, the alleged breach cannot be sufficiently material to give rise to a claim for rescission, since it is plainly, on the face of the pleadings, not so "substantial and fundamental" as to defeat the object of the parties in drafting the Agreement. *See, e.g., Faden Bayes Corp.*1997 WL 426100 at *2; *Lipsky*, 551 F.2d at 895.

> **2.    There Can Be No Rescission or Cancellation Because, on the Face of the Pleadings, the Parties Cannot Be Returned to the Status Quo Ante**

Finally, rescission or cancellation is plainly unavailable here because, on the face of the pleadings, this Court cannot conceivably restore the *status quo ante* that existed before the Agreement.  *Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher*, 299 A.D.2d 64, 71, 747 N.Y.S.2d 441, 446-47 (2002) ("Generally, a party cannot rescind a contract if that would injure the party against whom rescission is sought because, under the contract, that party has changed his position and cannot be returned to the status quo ante ") *citing Gravenhorst v. Zimmerman*, 236 N.Y. 22, 34–35, 139 N.E. 766 (1923); *Kamerman v. Curtis*, 285 N.Y. 221, 226, 33 N.E.2d 530 (1941)  As the *Sokolow* court explained, "where restoration of the status quo ante is made impractical by a substantial change of position, or by the nature of the transaction at issue the remedy of rescission will not be available."  299 A.D.2d at 71 (citations omitted)..

Here, on the face of the pleadings, it would be impossible to restore the parties to the respective positions they held before the Agreement.  The original *Godfather* novel was published more than 40 years ago, three original *Godfather* films have been produced and

distributed by Paramount, the original party to the Agreement long ago received payment for the

transfer of rights, and both parties have indisputably invested substantial time and effort in

creating *The Godfather* franchise.  If the 1969 Agreement were rescinded, the Court would not

only be unable to restore the parties to their pre-agreement positions, but would need to deal with

the tremendously complex task of determining the ownership of rights in the various *Godfather*

films and related derivative works.  There is simply no means for the Court to restore the status

of the parties to that which they held in 1969, before the first *Godfather* film was made or the

*Godfather* novel published, and for this reason alone rescission and cancellation is not an

available remedy.

###### B.        The Counterclaims Are Preempted by the Copyright Act

In addition, *all* of the Estate's Counterclaim is barred as a matter of law, because the

counterclaims are preempted by the Copyright Act, because, while framed as independent state-

law causes of action, the Estate's counterclaims do nothing more than assert that Paramount is

wrongfully claiming to own copyright interests that are in fact allegedly owned by the Estate.

Under Section 301 of the Copyright Act, claims brought pursuant to state law are

preempted by the Copyright Act where the following conditions exist: "(1) the subject matter of

the state-law right falls within the subject matter of the copyright laws; and (2) the state-law right

asserted is equivalent to the exclusive rights protected by federal copyright law." *Panizza v.

Mattel, Inc.,* No. 02 Civ. 7722, 2003 WL 22251317, at *2 (S.D.N.Y. Sept.30, 2003) (quoting

*Kregos v. Associated Press*, 3 F.3d 656, 666 (2d Cir.1993)).  As this Court has recently

explained, "the plain language of § 301 can be reasonably construed to foreclose not just those

state law claims that directly parallel the scope of the rights granted in the Copyright Act. Rather,

the "general scope" of the rights specified . . . arguably refers broadly to the type of rights

protected by copyright . . . ."  *WNET v. Aereo, Inc.*, 12 CIV. 1543 AJN, 2012 WL 1850911 (S.D.N.Y. May 18, 2012).

There can be no doubt that the "subject matter" of the Estate's counterclaims—namely, the book publishing, motion picture rights, and other rights to the sequel novels—fall within the subject matter of the copyright laws.  *Harper & Row Publishers, Inc.*, 723 F.2d at 200 (claim involving books satisfies subject matter element).  Thus, the only question is whether, in the context of this action, the Estate's counterclaims fall within the "general scope" requirement of rights "equivalent to the exclusive rights protected by federal copyright law."  *Kregos*, 3 F.3d at 666.  This requirement "is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir.2004) (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc*., 982 F.2d 693, 716 (2d Cir.1992)).  Courts examine "what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced," *Computer Assocs. Int'l*, 982 F.2d at 716, and the Second Circuit has held that courts must "take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Briarpatch Ltd.*, 373 F.3d at 306; *WNET*, 2012 WL 1850911 at *9.

Here, the Puzo Estate asserts that it owns the book publishing and motion picture rights under the Copyright Act to the sequel novels.  It also asserts that  Paramount's denial of the Estate's contention that it owns these rights is sufficient to constitute breach of contract and to give rise to counterclaims for cancellation, rescission, and tortious interference.  Counterclaim ¶¶ 2, 13.  At its core, the only question in dispute in the Counterclaim is a question of copyright ownership—the Counterclaim, in its entirety, is based on an assertion of ownership of the

copyright in the sequel novels, and an allegation that Paramount's claims of copyright ownership frustrated the Estate's enjoyment of its copyright interest in the sequel novels.   The only harm alleged by the Puzo Estate is harm to its alleged copyright interest, and the only alleged conduct by Paramount is the assertion that the copyright interest at issue belongs to Paramount.  Given that narrow scope of the dispute, the Estate's counterclaims are preempted by the Copyright Act.

### 1.      The Third Counterclaim for Breach of Contract Is Preempted

The Estate's counterclaim for breach of contract is preempted, in that it asserts no breach aside from Paramount's assertion of copyright ownership in the sequel novels.  Courts in this district have repeatedly held that contract claims that rest entirely upon allegations of a breach of a duty not to infringe an exclusive right conferred by the Copyright Act are preempted.   "[A] breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff."  *Am. Movie Classics Co. v. Turner Entm't Co.,* 922 F. Supp. 926, 931 (S.D.N.Y. 1996); *Wolff v. Inst. of Elec. & Electronics Engineers, Inc.*, 768 F. Supp. 66, 69 (S.D.N.Y. 1991).  While certain cases inside and outside of this District have suggested that breach of contract claims are never preempted by the Copyright Act, the weight of commenters and authority have rejected this rule and found breach of contract claims preempted where the contractual rights sought to be enforced are equivalent to those protected by the Copyright Act.  *See Canal Image UK Ltd. v. Lutvak,* 773 F. Supp. 2d 419, 443 (S.D.N.Y. 2011);  *Price v. Fox Entm't Group, Inc.*, 473 F.Supp.2d 446, 460–61 (S.D.N.Y.2007) (claim that author failed to pay profits and attribute passages to the plaintiff was preempted); *Cooper v. Sony Records Int'l,* No. 00–CV–233, 2001 WL 1223492, at *5 (S.D.N.Y. Oct. 15, 2001) (claim that licensee producer of music copyrighted in plaintiff artists' names had exploited music beyond scope of license was preempted); 5 William F. Patry, *Patry on*

*Copyright* at 18:26.50.  As a Court in this District has recently explained, citing the leading treatise on this issue:

> 'causes of causes of action ... denominated [as contract claims] at times may essentially allege nothing other than derogation of rights under copyright."  In those cases, "a breach of contract cause of action can serve as a subterfuge to control nothing other than the reproduction, adaptation, public distribution, etc. of works within the subject matter of copyright. Those instances are to be deemed pre-empted." That position makes sense . . . .

*Canal Image UK Ltd.*, 773 F. Supp. 2d at 444 (citing 1 David Nimmer, *Nimmer on Copyright* § 1.01[B][1][a][i]).  Here, while framed as an action for breach of contract, the Estate's counterclaims do nothing more than assert that Paramount's assertions as to copyright ownership are incorrect, and that the Estate in fact owns the relevant copyrights.  The appropriate remedy for the Puzo Estate's contentions would be a declaratory judgment counterclaim under the Copyright Act as to ownership, not a counterclaim for breach of contract.

### 2.      <u>The First and Second Counterclaims for Cancellation and Rescission Are Preempted</u>

The Puzo Estate's effort to cancel, terminate, and/or rescind the 1969 Agreement is also preempted, for at least two reasons.  First, assuming the breach of contract action is preempted, an attempt to rescind the contract based on an alleged material breach must also be preempted. Second, rescission necessarily entails a determination of copyright ownership by reference to the Copyright Act.  If the 1969 Agreement is rescinded, the Court would be required to determine ownership of the copyright without reference to the 1969 Agreement, and would accordingly have to determine the entitlement of the Puzo Estate to compensation due to its ownership of a copyright interest.  *In Santa-Rosa v. Combo Records*, 471 F.3d 224, 227 (1st Cir. 2006), the First Circuit considered the availability of rescission in a copyright dispute arising from an alleged breach of an agreement to pay royalties to the plaintiff, and determined that a claim for rescission

of a grant of copyright was preempted, because after rescission of the contract the court would be required to independently determine copyright ownership. *Id.* ("Because Santa Rosa seeks rescission of his contract, if we were to grant him the relief that he sought, we would be required to determine his ownership rights by reference to the Copyright Act. In such a case, there is little question that we would be merely determining whether [plaintiff] was entitled to compensation because of "mere copying" or "performance, distribution or display" of his recordings. As such, 17 U.S.C. § 301(a) preempts [plaintiff's] rescission claim."). In the present case, the remedy of rescission would require the Court to adjudicate a host of consequences relating to ownership of the many derivative works created in reliance on the 1969 Agreements and their progeny. Accordingly, for this reason alone, the rescission and termination claims are preempted.

### 3.  The Fourth Counterclaim for Tortious Interference Is Preempted

Finally, the Estate's claim for tortious interference with contract is also preempted. The tortious interference claim is based on nothing more than Paramount's alleged assertion, to publishers, of Paramount's rights under the Copyright Act (and the Interim Settlement Agreement, which, as discussed below, cannot serve as a basis for this claim). The interference is alleged to have done no more than to prevent the Estate from exercising the rights the Estate claims that it holds under the Copyright Act to publish the third sequel novel. Tortious interference claims which do no more than assert an interference with one of the rights protected by the Copyright Act are preempted. *See Titan Sports, Inc. v. Turner Broad. Sys., Inc.*, 981 F. Supp. 65, 74 (D. Conn. 1997) (holding that a tortious interference claim was preempted, and explaining that "The right that Plaintiff's contracts with [Defendant] seeks to protect is Plaintiff's exclusive ownership right in its copyrighted material—precisely what the Copyright Act seeks to protect"); *Harper & Row*, 723 F.2d at 201 ("[i]f there is a qualitative difference between the

[right of exclusivity based on the contract] and the exclusive right under the [Copyright] Act ... we are unable to discern it.  In both cases, it is the act of unauthorized publication which causes the violation.").

Accordingly, as they derive solely from the Estate's and Paramount's competing assertion of their respective copyright interests, all of the Estate's counterclaims are preempted by the Copyright Act.

**C.**    **In Addition To Being Preempted, the Tortious Interference Counterclaim Fails for Independent Reasons**

**1.**    **The Tortious Interference Counterclaim Is Barred by the Interim Settlement Agreement**

In addition to being preempted, the tortious interference counterclaim fails as a matter of law for additional reasons.  First, to the extent that this counterclaim depends upon the existence of the Interim Settlement Agreement, it is barred due to the Estate's express contractual undertakings.  The Fourth Counterclaim alleges as a basis for the purported "interference" that "Paramount would only provide the consent required by the Publishers, and would therefore only permit publication of "The Family Corleone," on condition that the Puzo Estate pay all the money it had received and will, in the future, receive from the Publishers in respect of 'The Family Corleone' into an escrow."  Counterclaim ¶ 27.

The Interim Settlement Agreement is the instrument that established this escrow.  Daum Decl. Ex.3 at ¶¶ 2.1, 2.3.  Under the Interim Settlement Agreement, (a) the Estate agreed to escrow funds from the third party publishers of *The Family Corleone*, and (b) Paramount agreed not to "enjoin, restrain, or prevent" the publication of *The Family Corleone* during the pendency of the litigation or seek damages from the publishers of that novel.

Critically, the Interim Settlement Agreement contains a provision memorializing the parties' agreement that the existence of the settlement agreement would not give rise to new potential claims or otherwise affect the claims of either party.  Paragraph 2.6 of the Interim Settlement Agreement provides that "Except for the matters expressly agreed to herein, this Interim Agreement shall not waive or affect any of the rights, remedies, or claims of any Party (including, *inter alia*, claims for damages, declaratory relief, cancellation, and termination").  *Id.* The Puzo Estate's reliance on the Interim Settlement Agreement to bring its fourth counterclaim clearly violates the unambiguous provision that the Interim Settlement Agreement would not *affect* any right, remedy, or claim of either of the parties.

Because its pleading is based on a written agreement that unambiguously bars the pleading (and is referred to in the Counterclaim) the Court may rely on the Interim Settlement Agreement to dismiss or limit the Fourth Counterclaim.  *See In re Del-Val Fin. Corp. Sec. Litig.*, 868 F. Supp. 547, 551-52 (S.D.N.Y. 1994) (dismissing complaint on motion to dismiss because of settlement agreement);  "A settlement is a contract, and once entered into is binding and conclusive." *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir.1989), cert. denied, 498 U.S. 865, 111 S.Ct. 177, 112 L.Ed.2d 141 (1990). "If the terms of the settlement agreement govern the situation before the court, then we have a duty to enforce the agreement.*" Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir.1974).  Accordingly, the tortious interference claim should be dismissed for this reason alone.[2]

---

[2] To the extent the Estate's other counterclaims depend on the Interim Settlement Agreement, they too should be barred for violating Paragraph 2.6 of that Agreement.

**2.      The Tortious Interference Counterclaim Fails Because No Breach of a Third-Party Contract Is Adequately Alleged**

Moreover, the tortious interference claim fails to adequately allege a critical element of its claim—that Paramount's conduct in fact  caused any third party to breach a contract with the Puzo Estate. In New York, an element of the claim for tortious interference with contract is that the alleged interference leads to  an actual contractual breach by a third party.  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (holding that "actual breach of the contract" is a required element of a pleading for tortious interference with contract, and affirming dismissal of tortious interference claim on a Rule 12(b)(6) motion for failing to allege that element); *Jack L. Inselman & Co., Inc. v. FNB Financial Co.*, 41 N.Y.2d 1078, 1080, 396 N.Y.S.2d 347, 349, 364 N.E.2d 1119, 1120 (1977) (stating that, for the plaintiff to have a claim for tortious interference with contract, "it is axiomatic that there must be a breach of that contract by the other party"); *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 420, 646 N.Y.S.2d 76, 79, 668 N.E.2d 1370, 1373 (1996) (holding that the complaint failed to plead a claim for tortious interference when the plaintiff failed to allege that the contract was in fact breached).

Here, the Puzo Estate  has made a perfunctory allegation of "breach" by the third parties to the contract, but the factual allegations of its pleading do not support this assertion.  There is no allegation that any publisher failed to publish *The Family Corleone* or to provide monies owed to the Estate.  Rather,  the Estate alleges that the publishers breached unspecified "Publishing Contracts" by declining to perform their obligations without Paramount's consent to publication—even though the Estate acknowledges, as it must, that Paramount in fact granted consent to publication during the pendency of this litigation. Counterclaim ¶ 12; Daum Decl. Ex. C at ¶ 2.2. The Puzo Estate also alleges a "breach" of the "Publishing Contract" due to the

establishment of the escrow account, but it is unclear how the establishment of an escrow

account as between Paramount and the Estate could conceivably have breached, or even affected,

a contractual obligation of any third party publisher.  The Estate has simply not adequately pled a

contractual obligation by the publisher that was breached due to an action by Paramount.

Accordingly, the element of breach of contract has not been adequately pled, and the tortious

interference counterclaim is defective on its face.

<strong>3.     The Tortious Interference With Contract Counterclaim Fails Because It Is Based Upon Paramount's Assertion of Its Legal Rights, Which Is Privileged and Protected Activity</strong>

Moreover, as discussed above, the Puzo Estate's tortious interference counterclaim is

entirely based upon Paramount's assertions of its legal rights under the Copyright Act.  A party's

mere assertion of its legal rights, including in a lawsuit, cannot serve as the basis for a tortious

interference claim without raising serious constitutional concerns.   In *Suburban Restoration Co.,*

*Inc. v. ACMAT Corp.*, 700 F.2d 98, 101-02 (2d Cir. 1983), the Second Circuit considered a claim

for tortious interference with contract brought under Connecticut law, based upon the filing of a

lawsuit.  The *Suburban Restoration* court considered the serious constitutional problems—

involving the First Amendment right to petition the government through the courts—with basing

a state-law tortious interference law upon the filing of a lawsuit.  It held that applying state law

in this area might violate the *Noerr-Pennington* doctrine.  *See id.*  The court concluded that,

because of these constitutional problems, it would construe the Connecticut law of tortious

interference to not extend to the act of filing a lawsuit. *Id.* ("We believe that Connecticut's courts

would be guided by the strong suggestions from the federal courts that imposing liability for the

act of filing a non-sham lawsuit would present serious constitutional problems, and would

construe Connecticut law to avoid those problems. Especially since *Noerr-Pennington's* statutory exemption is defined in terms of first amendment activity, we are confident that Connecticut's courts would carve out a similar exception . . . In short, we conclude that the activity complained of here-the filing of a single non-sham lawsuit-cannot form the basis of a claim under [] Connecticut's common law of tortious interference with a business expectancy.").

Here, this Court should similarly construe New York law, and hold that the mere act of filing a lawsuit or asserting legal rights under a contract cannot form the basis of a claim for tortious interference with contract.  Since the assertion by Paramount of its rights forms the sole basis for the Puzo Estate's tortious interference counterclaim, it is barred as a matter of law.

Moreover, to the extent it is based on Paramount's assertion of its legal rights in this lawsuit and elsewhere, the Puzo Estate's tortious interference counterclaim should be barred by New York's privilege that applies to statements made in the context of litigation. "Under New York law, '[i]n the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation.  The test of 'pertinency' is extremely broad and embraces 'anything that may possibly or plausibly be relevant or pertinent with the barest rationality, divorced from any palpable or pragmatic degree of probability.'" *Aequitron Med., Inc. v. Dyro*, 999 F. Supp. 294, 297-98 (E.D.N.Y. 1998) (citing *O'Brien v. Alexander,* 898 F.Supp. 162, 171 (S.D.N.Y.1995)).  While New York has not yet addressed the application of the litigation privilege to tortious interference, as opposed to defamation claims, other states have long recognized that the litigation privilege applies to bar tortious interference claims based on litigation-related statements.  *See e.g., Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Ins. Co.*, 639 So. 2d 606 (Fla. 1994) (recognizing application of litigation privilege to tortious interference claims);

*AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269 (2d Cir. 1992) (recognizing that neither California nor Connecticut law permit tortious interference claims based upon the filing of a lawsuit or statements made in connection with litigation).  Accordingly, Paramount's filing of the instant lawsuit, and statements made concerning its assertion of rights in this lawsuit, are privileged and cannot form the basis of a tortious interference claim.

## V.   **CONCLUSION**

For the foregoing reasons, the Puzo Estate's Amended and Restated Counterclaims should be dismissed. Moreover, as these counterclaims have already been amended once following submission of a motion to dismiss, and there is no reasonable possibility that an amendment could save these fatally defective claims, Paramount respectfully submits that the dismissal be with prejudice.

Dated:  Los Angeles, California
        June 12, 2012

KENDALL BRILL & KLIEGER LLP


By:/s Richard B. Kendall

Richard B. Kendall
Nicholas F. Daum
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California  90067
Tel:  (310) 556-2700
Fax: (310) 556-2705
E-mail:  rkendall@kbkfirm.com

*Attorneys for Plaintiff and Counter-Defendant Paramount Pictures Corporation*

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...................................................................1

II.    STATEMENT OF ALLEGED FACTS .....................................................5

III.   STANDARD OF REVIEW ........................................................................9

IV.   ARGUMENT ............................................................................................10

     A.    The Cancellation and Rescission Counterclaims Fail ...........................10

          1.    There Can Be No Rescission or Cancellation Because, on the Face of the Pleadings, the Alleged Breach Is Not Sufficiently Material, Substantial, and Fundamental to Cancel the Contractual Rights ..............10

          2.    There Can Be No Rescission or Cancellation Because, on the Face of the Pleadings, the Parties Cannot Be Returned to the Status Quo Ante ........................................................................................................14

     B.    The Counterclaims Are Preempted by the Copyright Act .....................15

          1.    The Third Counterclaim for Breach of Contract Is Preempted ................17

          2.    The First and Second Counterclaims for Cancellation and Rescission Are Preempted .........................................................................18

          3.    The Fourth Counterclaim for Tortious Interference Is Preempted ...........19

     C.    In Addition To Being Preempted, the Tortious Interference Counterclaim Fails for Independent Reasons ...........................................20

          1.    The Tortious Interference Counterclaim Is Barred by the Interim Settlement Agreement .............................................................................20

          2.    The Tortious Interference Counterclaim Fails Because No Breach of a Third-Party Contract Is Adequately Alleged .....................................22

          3.    The Tortious Interference With Contract Counterclaim Fails Because It Is Based Upon Paramount's Assertion of Its Legal Rights, Which Is Privileged and Protected Activity ..................................23

V.     CONCLUSION.........................................................................................25

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aequitron Med., Inc. v. Dyro*,
  999 F. Supp. 294 (E.D.N.Y. 1998) ................................................................. 24

*Aetna Cas. & Sur. Co. v. O'Connor*,
  8 A.D.2d 530, 190 N.Y.S.2d 795 (2d Dep't 1959) ........................................ 10

*Am. Movie Classics Co. v. Turner Entm't Co.*,
  922 F. Supp. 926 (S.D.N.Y. 1996) ............................................................. 4, 17

*Ariel (UK) Ltd. v. Reuters Group PLC*,
  05 CIV. 9646 (JFK), 2006 WL 3161467 (S.D.N.Y. Oct. 31, 2006) ................ 13

*AroChem Int'l, Inc. v. Buirkle*,
  968 F.2d 266 (2d Cir. 1992) ........................................................................... 25

*Arthur Guinness & Sons, PLC v. Sterling Publishing Co.*,
  732 F.2d 1095 (2d Cir.1984) .......................................................................... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................... 9, 10

*Babylon Assocs. v. County of Suffolk*,
  101 A.D.2d 207, 475 N.Y.S.2d 869 (2d Dep't 1984) ..................................... 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................... 9

*Brass v. Amer. Film Techn., Inc.*,
  987 F.2d 142 (2d Cir.1993) .............................................................................. 5

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
  373 F.3d 296 (2d Cir.2004) ............................................................................ 16

*Canal Image UK Ltd. v. Lutvak*,
  773 F. Supp. 2d 419 (S.D.N.Y. 2011) ....................................................... 17, 18

*Canfield v. Reynolds*,
  631 F.2d 169 (2d Cir.1980) ............................................................................ 10

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
  982 F.2d 69 (2d Cir.1992) .............................................................................. 16

*Cooper v. Sony Records Int'l*,
  No. 00–CV–233, 2001 WL 1223492 (S.D.N.Y. Oct. 15, 2001) ..................... 17

*Faden Bayes Corp. v. Ford Motor Co.*,
  97 CIV. 1867 (MBM), 1997 WL 426100 (S.D.N.Y. July 30, 1997)....................... 11, 14

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  723 F.2d 195 (2d Cir. 1983)..................................................................... 4, 16, 19

*In re Del-Val Fin. Corp. Sec. Litig.*,
  868 F. Supp. 547 (S.D.N.Y. 1994) ............................................................... 21

*In re Stein and Day Inc.*,
  80 B.R. 297 (Bkrtcy.S.D.N.Y.1987)............................................................... 13

*In Santa-Rosa v. Combo Records*,
  471 F.3d 224 (1st Cir. 2006) ................................................................... 18, 19

*Jack L. Inselman & Co., Inc. v. FNB Financial Co.*,
  41 N.Y.2d 1078, 396 N.Y.S.2d 347, 364 N.E.2d 1119 (1977)....................................... 22

*Janneh v. GAF Corp.*,
  887 F.2d 432 (2d Cir.1989)....................................................................... 21

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388  (2d Cir. 2006)..................................................................... 22

*Kregos v. Associated Press*,
  *3 F.3d 656  (2d Cir.1993)* ...................................................................... 16

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)........................................... 22

*Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Ins.
Co.*,
  639 So. 2d 606 (Fla. 1994)....................................................................... 24

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir.1976)...................................................................... 11, 14

*Lovasz v. Fowler*,
  211 A.D. 860, 207 N.Y.S. 871 (1924) .............................................................. 12

*Maldonado v. Valsyn, S.A.*,
  06 CIV. 15290 (RMB), 2009 WL 3094888 (S.D.N.Y. Sept. 23, 2009) .................... 11, 13

*Meetings & Expositions, Inc. v. Tandy Corp.*,
  490 F.2d 714 (2d Cir.1974)........................................................................ 21

*Mina Inv. Holdings Ltd. v. Lefkowitz*,
  16 F. Supp. 2d 355 (S.D.N.Y. 1998)............................................................... 11

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
  92 N.Y.2d 458,  682 N.Y.S.2d 664, 705 N.E.2d 656 (1998)........................................... 12

*Ogunsanya v. Langmuir*,
  08-CV-940 (JG), 2008 WL 4426590 (E.D.N.Y. Sept. 26, 2008) .................................... 10

*Palazzetti Import/Export, Inc. v. Morson*,
    No. 98 Civ. 722, 2001 WL 1568317 (S.D.N.Y. Dec. 6, 2001)........................................ 12

*Panizza v. Mattel, Inc.*,
    No. 02 Civ. 7722, 2003 WL 22251317 (S.D.N.Y. Sept.30, 2003) .................................. 15

*Price v. Fox Entm't Group, Inc.*,
    473 F.Supp.2d 446 (S.D.N.Y.2007)........................................................................... 17

*RT Computer Graphics, Inc. v. United States,*
    44 Fed. Cl. 747 (Fed. Cl. 1999) ................................................................................. 12

*Santa-Rosa v. Combo Records*,
    471 F.3d 227 (1st Cir. 2006) ....................................................................................... 4

*Septembertide Publ'g, B.V. v. Stein and Day, Inc.*,
    884 F.2d 675 (2d Cir.1989)................................................................................... 3, 11

*Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher*,
    299 A.D.2d 64, 747 N.Y.S.2d 441 (2002) ................................................................. 14

*Suburban Restoration Co., Inc. v. ACMAT Corp.*,
    700 F.2d 98 (2d Cir. 1983)....................................................................................... 23

*Titan Sports, Inc. v. Turner Broad. Sys., Inc.*,
    981 F. Supp. 65 (D. Conn. 1997)............................................................................. 19

*WNET v. Aereo, Inc.*,
    12 CIV. 1543 AJN, 2012 WL 1850911 (S.D.N.Y. May 18, 2012) ............................ 3, 16

*Wolff v. Inst. of Elec. & Electronics Engineers, Inc.*,
    768 F. Supp. 66 (S.D.N.Y. 1991) ............................................................................. 17

## STATUTES

17 U.S.C. § 301 ........................................................................................................ 3, 15, 19

Fed. R. Civ. P. 12(b)(6)............................................................................................ 1, 5, 9, 22

## TREATISES

5 William F. Patry, *Patry on Copyright* at 18:26.50.................................................... 18