UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
                                   :

PARAMOUNT PICTURES
CORPORATION,
                                   :

               Plaintiff,                  **Civil Action No.  12 CIV-1268 (AJN)**

                                 :

     -against-                 ECF CASE

ANTHONY PUZO, AS EXECUTOR OF    :
THE ESTATE OF MARIO PUZO,        **ORAL ARGUMENT REQUESTED**

                                 :

              Defendant.
                                 :

------------------------------------ X

## DEFENDANT AND COUNTERCLAIMANT'S
## OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION. ................................................................... 1

II.     STATEMENT OF FACTS. ........................................................ 1

III.    PARAMOUNT RELIES ON AN UNREASONABLE AND ILLOGICAL
        CONSTRUCTION OF ITS FORM CONTRACT. ................................ 7

IV.     CANCELLATION IS AN APPROPRIATE REMEDY. ......................... 8

V.      EVEN RESCISSION WOULD BE PROPER ................................... 10

VI.     PARAMOUNT'S ACTS CONSTITUTED A REPUDIATION AND A
        BREACH. ............................................................................. 13

VII.    PARAMOUNT'S BREACH AND REPUDIATION WERE
        "MATERIAL." ...................................................................... 16

VIII.   PARAMOUNT INDUCED A BREACH BY THE PUBLISHERS. ............ 17

IX.     THE COUNTERCLAIMS ARE NOT PREEMPTED BY THE
        COPYRIGHT ACT. ................................................................ 18

X.      CONCLUSION ...................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

A & Z Appliances, Inc. v. Electric Burglar Alarm Co.,
    455 N.Y.S.2d 674 (1982)..................................................................................7

Aetna Cas. & Sur. Co. v. O'Connor,
    190 N.Y.S.2d 795 (1959)................................................................................10

Affymax Inc. v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.,
    660 F.3d 281 (7th Cir. 2011).........................................................................23

Ajettix v. Raub,
    804 N.Y.S.2d 580 (2005)...............................................................................10

Am. Movie Classics Co. v. Turner Entm't Co.,
    922 F.Supp. 926 (S.D.N.Y. 1996) .................................................................24

American Well Works v. Layne & Bowler Co.,
    241 U.S. 257, 60 L.Ed. 987 (1916)...............................................................20

Architectronics, Inc. v. Control Systems, Inc.,
    935 F.Supp. 425 (S.D.N.Y. 1996) .................................................................21

Ariel (UK) Ltd. v. Reuters Group PLC,
    2006 WL 3161467 (S.D.N.Y. 2006) .............................................................12

Arthur Guinness & Sons PLC v. Sterling Publishing Co.,
    732 F.2d 1045 (2d Cir. 1984) ........................................................................12

Briarpatch Ltd. v. Phoenix Pictures, Inc.,
    373 F.3d 296 (2d. Cir. 2004) .............................................................18, 19, 23

Brignoli v. Balch Hardy & Scheinman, Inc.,
    645 F.Supp. 1201 (S.D.N.Y. 1986) ...............................................................21

Buffalo Builders Supply Co. v. Reeb,
    247 N.Y. 170 (1928)......................................................................................10

Canal + Image UK Ltd. v. Lutvak,
    773 F.Supp.2d 415 (S.D.N.Y. 2011) ........................................................18, 19

Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.,
    747 N.Y.S.2d 468 (2002).................................................................................9

# TABLE OF AUTHORITIES
## (continued)

Page

Cooper v. Sony Records Int'l,
   2001 WL 1223492 (S.D.N.Y. 2001) ............................................................... 24

Faden Bayes Corp. v. Ford Motor Co.,
   1997 WL 426100 (S.D.N.Y.) ........................................................................ 12

Firoozye v. EarthLink Network,
   153 F.Supp.2d 1115 (N.D. Cal. 2001)........................................................... 23

First Hartford etc. Trust v. United States,
   194 F.3d 1279 (Fed. Cir. 1999) ...................................................................... 9

Graham v. James,
   144 F.3d 229 (2d Cir. 1998) .................................................................... 10, 19

Hampton v. District Council,
   411 N.Y.S.2d 124 (1978)................................................................................ 13

Hanley Co. Inc. v. Bradley,
   259 N.Y.S. 278 (1927).................................................................................... 11

In re Randall's Island etc. Centers,
   261 B.R. 96 (U.S. Bkr. Ct. S.D.N.Y. 2001) .................................................... 9

Kamerman v. Curtis,
   285 N.Y. 221 (1941)....................................................................................... 12

Lennon v. Seaman,
   63 F.Supp.2d 428 (S.D.N.Y. 1999) ............................................................... 22

Lovasz v. Fowler,
   207 N.Y.S. 871 (1924).................................................................................... 15

Maldonado v. Valsyn,
   2009 WL 3094888 (S.D.N.Y. 2009) ............................................................. 12

Morgan v. McCaffrey,
   789 N.Y.S.2d 274 (2005).......................................................................... 9, 13

Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,
   92 N.Y.2d 458 (1998)..................................................................................... 15

Nova Design Build, Inc. v. Grace Hotels, LLC,
   652 F.3d 814 (7th Cir. 2011) ......................................................................... 23

Ogunsanya v. Langmuir,
   2008 WL 4426590 (E.D.N.Y. 2008) ............................................................. 10

## TABLE OF AUTHORITIES
### (continued)

Page

Palazzetti Import/Export, Inc. v. Morson,
    2001 WL 1568317 (S.D.N.Y. 2001) ..................................................13, 15

Penthouse Intern. v. Dominion Fed. Sav. & Loan,
    665 F.Supp. 301 (S.D.N.Y. 1987) ..................................................15, 17

Price v. Fox Entm't Group, Inc.,
    473 F.Supp.2d 446 (S.D.N.Y. 2007) ....................................................24

Record Club of America, Inc. v. United Artists Records, Inc.,
    643 F.Supp. 925 (S.D.N.Y. 1986) .......................................................13

Rotardier v. Entertainment Co. Music Group,
    518 F.Supp. 919 (S.D.N.Y. 1981) .......................................................23

RT Computer Graphic, Inc. v. United States,
    44 Fed. Cl. 747 (1999)...................................................................15

Santa-Rosa v. Combo Records,
    471 F.3d 224 (1st Cir. 2006)...........................................................24

Scholastic Entertainment, Inc. v. Fox Entertainment Group, Inc.,
    336 F.3d 982 (9th Cir. 2003) ...........................................................19

Scutti Pontiac, Inc. v. Rund,
    402 N.Y.S.2d 144 (1978).................................................................7

Septembertide Publishing, B.V. v. Stein & Day,
    884 F.2d 675 (2d Cir. 1989) ...........................................................12

Sklar Door Corp. v. Locoteta Homes, Inc.,
    224 N.Y.S.2d 294 (1961)................................................................7

Sterling Motor Truck Co. v. Schuchman,
    260 N.Y. 358 (1932).....................................................................11

T.B. Harms Co. V. Eliscu,
    339 F.2d 823 (2d Cir. 1964), cert. den. 381 U.S. 915 (1965)..........................19, 23

The Kirke La Shelle Co. v. The Paul Armstrong Co.,
    263 N.Y. 79 (1933).....................................................................14

Titan Sports, Inc. v. Turner Broad. Sys., Inc.,
    981 F.Supp. 65 (D. Conn. 1997).......................................................24

Torah Soft Ltd. v. Drosnin,
    224 F.Supp.2d 704 (S.D.N.Y. 2002) ..................................................21

## TABLE OF AUTHORITIES
### (continued)

Page

WNET v. Aereo, Inc.,
    2012 WL 1850911 (S.D.N.Y.) ...................................................................... 24

Wolff v. Institute of Electrical & Electronic Engineers, Inc.,
    768 F.Supp. 66 (S.D.N.Y. 1991) ........................................................ 21, 24

**STATUTES**

17 U.S.C.A. §106 ........................................................................................ 19

17 U.S.C.A. §301 ................................................................................. 18, 21

House Report No. 94-1476 2d Sess., p. 132 .............................................. 21

**OTHER AUTHORITIES**

10 Corbin on Contracts Op.cit. §973 ........................................................ 17

12 Corbin on Contracts (Interim Ed.)
    §1107 ............................................................................................... 9, 11
    §1109 ................................................................................................... 11
    §1112 ............................................................................................... 9, 11
    §1113 ............................................................................................... 9, 11

13 Corbin on Contracts (Rev. Ed.)
    §67.2 ....................................................................................................... 9
    §67.8(3) ................................................................................................... 9
    §68.1 ..................................................................................................... 15
    §68.4(1) ................................................................................................. 16
    §68.5(1)(b) ............................................................................................. 13

II Farnsworth on Contracts (3d Ed.)
    §8.15 ....................................................................................................... 9
    §8.21 ..................................................................................................... 13

3 Nimmer, On Copyrights § 12.01[A][2] p. 12-35 ................................... 19

Goldstein, On Copyright, §17.2.1 .............................................................. 21

Goldstein, On Copyright, §17.9.1.1 ........................................................... 21

Restatement of Contracts 2d §250 Comment b ......................................... 14

26 Williston on Contracts (4th Ed.) §68.3 ................................................. 11

I.   **INTRODUCTION.**

The Amended Counterclaims allege a material breach and repudiation by Paramount, permitting cancellation of its future contract rights.  Paramount claims incorrectly that cancellation and rescission are "the same."  It argues that there was no repudiation and that any repudiation and breach were not sufficiently material to permit rescission.  Paramount is not correct; but, at best, these arguments raise questions of fact. Paramount adds a new argument, preemption.  But the Counterclaims turn on the meaning of the contract, not construction of the Copyright Act.  They do not allege any act of infringement, and they involve "extra elements" not required for an infringement action.  Under the cases, each of these factors bars preemption.

II.   **STATEMENT OF FACTS.**

Paramount has not fully or accurately set out the allegations of the Amended Counterclaim.  They are as follows:

Prior to 1967, Mario Puzo had written and published short stories and two critically acclaimed novels, "Fortunate Pilgrim" and "The Dark Arena" (Am. Counterclaims ¶ 1, p. 6).  Then, Puzo wrote "The Godfather."  It became one of the best selling books of all time, as well as an Academy Award winning film, bringing enormous and badly needed revenue to Paramount (Am. Counterclaims ¶ 2, p. 8).

In 1967, Puzo entered into a written agreement with Paramount, giving Paramount an option to acquire various rights in "The Godfather" (the "1967 Agreement").  The 1967 Agreement was drafted by Paramount.  It expressly excluded "book publication rights" from the rights Paramount could acquire (Fields Decl. Ex. "A" p. 1).

In 1969, Paramount entered into another written agreement with Puzo (the "1969 Agreement"). This agreement was prepared by Paramount on its standardized printed form (Am. Counterclaims ¶ 2, p. 7). Its printed boilerplate gave Paramount broadly described rights. But, the parties struck, from the form, language that would have given Paramount any right "to publish said work and/or any versions or adaptations thereof, or any part or parts thereof and to vend copies thereof" (Am. Counterclaims ¶ 2, p. 7).

Excluding "book publication rights" from the 1967 Agreement and striking this language from the 1969 Agreement were intended to reserve in Puzo book publishing rights in all parts and elements of "The Godfather," including the characters that were such an important part of "The Godfather," and the right to depict those characters in new and different situations, i.e., in sequels (Am. Counterclaims ¶ 2, p. 7).

In 1971, Paramount entered into a written contract with Puzo for Puzo to write a sequel to "The Godfather" in screenplay form (the "Godfather II Sequel Agreement"). Puzo's screenplay, depicting characters that were part of "The Godfather" in new and different situations, became a sequel motion picture entitled "Godfather II." (Am. Counterclaims ¶ 3, p. 8).

In making the Godfather II Sequel Agreement, Paramount recognized that Puzo retained book publishing rights in "The Godfather" characters in new and different situations; and, even though Puzo was commissioned and paid by Paramount to write this sequel, the contract provided that he had the right to publish a sequel novel based on his screenplay (Am. Counterclaims ¶ 3, pp. 8-9).

In 1977, Paramount entered into another written contract with Puzo for Puzo to write a treatment for still another sequel to "The Godfather," which ultimately became "Godfather III" (the "Godfather III Treatment Contract"). Again, Paramount recognized that Puzo retained book publishing rights in characters that were part of "The Godfather" in new and different situations; and, again, even though this sequel, like the sequel that became "Godfather II," was commissioned and paid for by Paramount, the Godfather III Treatment Contract provided that book publishing rights in the sequel treatment were reserved in Puzo (Am. Counterclaims ¶ 4, p. 9).

In 1986, Puzo entered into still another written contract with Paramount, this time for Puzo to write a sequel screenplay for "Godfather III" (the "Godfather III Sequel Agreement"). Once again, Paramount recognized that Puzo had retained all book publication rights in the "Godfather" characters and, like the Godfather II Sequel Agreement and the Godfather III Treatment Contract, the Godfather III Sequel Agreement provided that Puzo, rather than Paramount, would have book publishing rights in Puzo's sequel screenplay for "Godfather III," even though that sequel was commissioned and paid for by Paramount (Am. Counterclaims ¶¶ 3-6, pp. 8-10).

The rights Paramount acquired for $50,000 under the 1969 Agreement had a reasonable value in excess of $100 million. Paramount used those rights to generate revenues in excess of $1 billion (Am. Counterclaims ¶ 7, p. 10).

Puzo died in 1999. His heirs are his children. His son, Anthony Puzo is Executor of his Estate. In 2001, the Estate hired and paid a writer to write a book sequel to "The

Godfather." In 2002, Paramount threatened to prevent publication of that book, claiming, for the first time, that it owned book publishing rights in sequels to "The Godfather."

Naturally, the Estate disagreed. It contended that Paramount never had book publishing rights, that those rights were reserved by Puzo. However, to allow publication of the book without costly litigation, the Estate agreed, in this one instance, to Paramount's demand for motion picture rights in the sequel, in exchange for Paramount not opposing its publication. The memorandum agreement on this subject expressly provided that it covered only this one book and that the parties reserved all of their rights as to any subsequent sequels (Am. Counterclaims ¶ 9, p. 10).

In 2006, the Puzo Estate published another book that was a sequel to "The Godfather." This was "The Godfather's Revenge," written by an author hired and paid entirely by the Estate. It included characters that were part of "The Godfather" in new and different situations; but it also contained new, original characters and new and original story material created for the Estate. Although Paramount was aware of the publication of this sequel book from its inception in 2006, it made no protest or objection at the time of publication, or at any time during the next five years (Am. Counterclaims ¶ 10, p. 11).

In 2009, having received no objection to its 2006 publication of "The Godfather's Revenge," the Estate decided to publish a book based on part of an original screenplay written by Puzo himself that was another potential "Godfather" sequel. This was a "spec." screenplay, i.e., one written by Puzo on his own, unpaid and not pursuant to any agreement with Paramount (Am. Counterclaims ¶ 11, p. 11).

On February 4, 2010, counsel for the Estate wrote Paramount enclosing Puzo's spec. screenplay, notifying Paramount that the Estate intended to contract for publication of a book based on a part of that screenplay and asking if Paramount was interested in making a deal for a film based on the book (Am. Counterclaim, Ex. "A").

But Paramount remained silent. On March 26, 2010, four years having passed with no objection to the last sequel book, and seven weeks having passed with no response to counsel's notice of February 4, 2010, the Estate entered into a contract for publication of a book based on part of Puzo's original "spec." screenplay. The Estate also hired and paid an author to write that book, ultimately entitled "The Family Corleone" (Am. Counterclaims ¶ 11, pp. 11, 12).

Paramount's silence continued. After receiving no response to his notice for over a year, counsel for the Puzo Estate wrote again on May 23, 2011, advising Paramount again that the Estate was publishing a sequel book based on part of Puzo's original screenplay and again asking if there could be interest in a film deal (Am. Counterclaims, Ex. "B"). Again, many months went by with no response.

In December 2011, more than five years after publication of the last sequel and almost two years after the Estate's notice to Paramount that it was about to contract for another sequel, and after the Estate had hired and paid a writer and had firmly committed itself under written publishing contracts for "The Family Corleone," Paramount finally responded. Its response, after all these years of silence, was to repudiate Puzo's book publishing rights. Paramount insisted to the Puzo Estate that the studio automatically owned all book publishing rights in Puzo's screenplay, in "The Family Corleone" and in

any other such sequel, and that the Estate had no right to publish that book or any other book using "Godfather" characters in new and different situations (Am. Counterclaims ¶¶ 11, 13, pp. 12, 13).

In March 2012, Paramount filed this action against Puzo's Estate seeking a declaration that Paramount automatically owned the book publishing rights in "The Family Corleone" and in any book that was a sequel to "The Godfather."

Paramount did not simply file suit. It took direct action to prevent the Estate's exercise of its publishing rights. It contacted the publishers of the book, insisting that neither they nor the Estate had any right to publish "The Family Corleone." As a result, the publishers required Paramount's consent as a condition to performing their contracts. And Paramount would not give that required consent unless the Estate agreed to escrow all funds received or to be received in respect of that publication (Am. Counterclaims ¶ 13b, pp. 13-14).

Subsequently, Paramount amended its complaint to add the claim that, without any contract or payment, it automatically had the right to make films based on the original, new characters and original new story material created by Puzo in his spec. screenplay or created by the author hired and paid by Puzo's Estate to write "The Family Corleone."  In addition, Paramount demanded compensatory, punitive and treble damages from the Puzo Estate.

In its Amended Counterclaim, the Puzo Estate asks the Court to declare that it owns the book publishing rights in any sequel book, that Paramount cannot prevent the Estate from publishing such a book and that Paramount does not automatically have film

rights in new characters and new story material depicted in any such book written by Puzo or by an author hired and paid for by the Puzo Estate.

The rights repudiated and violated by Paramount were of fundamental and critical importance to Puzo and were of the essence of the 1969 Agreement. More than once, Puzo said "Books are *my* world," explaining why Paramount didn't get book rights and wouldn't get them (Am. Counterclaims ¶ 14, pp. 15-16). During Puzo's lifetime, Paramount never asserted any of its present claims (Am. Counterclaims ¶ 8, p. 10). Book rights were of the essence to Puzo, so that, if Paramount had made its present claims, Puzo would not have made any of the foregoing contracts (Am. Counterclaims ¶ 14, p. 15).

Because Paramount disavowed Puzo's essential rights under the 1969 Agreement, claimed rights it did not own under that agreement, interfered with the Estate's exercise of its contract rights and imposed added and unjustified conditions to the Estate's exercise of those rights, the Puzo Estate has also asked this Court to declare Paramount's future rights under the 1969 Agreement cancelled for its material breach and repudiation.

## III.   PARAMOUNT RELIES ON AN UNREASONABLE AND ILLOGICAL CONSTRUCTION OF ITS FORM CONTRACT.

Having been prepared by Paramount on its standardized, printed form, the 1969 Agreement must be construed "most strongly" against Paramount. A & Z Appliances, Inc. v. Electric Burglar Alarm Co., 455 N.Y.S.2d 674, 675 (1982); Scutti Pontiac, Inc. v. Rund, 402 N.Y.S.2d 144, 148 (1978); Sklar Door Corp. v. Locoteta Homes, Inc., 224 N.Y.S.2d 294, 296 (1961).

Even aside from that basic rule, the construction urged by Paramount also defies reason and logic. For example, the 1969 Agreement gave Paramount the right to produce "Godfather" sequels. If the language giving Paramount book publishing rights had not been stricken, it would have given Paramount book publishing rights not just in the original film, but also in sequels. It follows, therefore, that deleting that language excluded book publishing rights in sequels, as well as in the original film.

Moreover, a sequel is simply the use of the original characters in a new and different situation. The contract reserves in Puzo not just book rights in "The Godfather" as a whole, but also in all elements that are a *"part of"* that book. Certainly, Puzo's unique characters are a "part of" "The Godfather." Thus, the language reserves in Puzo book rights in those characters, regardless of the story in which they appear.

## IV.    CANCELLATION IS AN APPROPRIATE REMEDY.

Paramount's memorandum is based on the erroneous premise that the Puzo Estate is seeking "rescission," because, as Paramount tells this court, "rescission and cancellation are the same remedy" (D. Mem. p. 10). But, rescission and cancellation are not "the same remedy." They are two different and alternative remedies for a material breach or repudiation. The remedy the Estate seeks is cancellation.[1]

Rescission is, of course, a reversion to the pre-contract status quo. Generally, the non-breaching party returns the consideration he has received and gets restitution of the

---

[1] Because of Paramount's argument, the Puzo Estate has added an "alternative and conditional" claim for rescission and restitution, which would apply if the court ruled that the Estate's claim is really one for rescission, or that the Estate could only end the 1969 Agreement by rescission.

reasonable value of what was provided to the breaching party under the rescinded contract.  See 12 Corbin on Contracts (Interim Ed.) §1107, p. 25, §1112, p. 44, §1113, p. 49.  E.g., First Hartford etc. Trust v. United States, 194 F.3d 1279, 1296 (Fed. Cir. 1999) ["rescission" amounts to the unmaking of a contract or an undoing of it from the beginning and not merely a termination of the contract"].

By contrast, cancellation of a contract for material breach or repudiation ends the contract only prospectively, rather than going back to the status quo ante.  "Cancellation 'occurs when either party puts an end to the contract for breach by the other.'"  It is "applicable only to the rendition of further performance as provided in the contract."  It extinguishes only the "future obligations of both parties to the agreement."  13 Corbin on Contracts (Rev. Ed.) §67.2 pp. 9, 12, §67.8(3) p. 57 (emphasis added).

"An anticipatory repudiation that substantially impairs the promisor's expectations has the following effect: (1) the non-breaching party may cancel the contract . . ."  Corbin, Op. Cit. §68.4(1) p. 186.  Accord, II Farnsworth on Contracts (3d Ed.) §8.15 p. 511 [on repudiation "the injured party may treat the contract as terminated"].

"Under New York law, an anticipatory breach, like any other breach, gives the non-breaching party two mutually exclusive options.  He may elect to treat the contract as terminated and exercise his remedies, or continue to treat the contract as valid [citations]."  In re Randall's Island etc. Centers, 261 B.R. 96, 101 (U.S. Bkr. Ct. S.D.N.Y. 2001).  Morgan v. McCaffrey, 789 N.Y.S.2d 274, 276 (2005) [judgment "cancelling the contract" for anticipatory breach affirmed]; Computer Possibilities Unlimited, Inc. v.

Mobil Oil Corp., 747 N.Y.S.2d 468, 475 (2002) [Repudiation warranted termination of the contract].

In this case, the Estate seeks cancellation of Paramount's future rights to make more "Godfather" movies, a remedy far less costly to the studio than rescission, since Paramount would not be required to restore to the Puzo Estate the reasonable value of the rights it provided. Under either remedy, Paramount's rights in the three "Godfather" films already produced would be unimpaired.

Paramount relies on two cases as support for its erroneous assertion that cancellation is "the same" as rescission, so that the Estate must meet what Paramount argues are the requirements of a rescission claim (Par. Mem. p. 10). Neither case so holds. Aetna Cas. & Sur. Co. v. O'Connor, 190 N.Y.S.2d 795 (1959), denies rescission for fraud in an insurance application, because the contract expressly provided that the exclusive remedy for such fraud was cancellation, not rescission. Ogunsanya v. Langmuir, 2008 WL 4426590 (E.D.N.Y. 2008), involves an attempt to "cancel" a purported contract because the parties did not agree on price. It says that the result of the failure to agree is like a rescission. The case has nothing to do with the remedy of canceling a binding contract for material breach or repudiation.

## V.    **EVEN RESCISSION WOULD BE PROPER.**

"Material breach" of an agreement also gives rise to a right of rescission. E.g., Graham v. James, 144 F.3d 229, 237 (2d Cir. 1998). In the event of "rescission," the Court has broad discretion to structure a fair and practical order. Buffalo Builders Supply Co. v. Reeb, 247 N.Y. 170, 176 (1928); Ajettix v. Raub, 804 N.Y.S.2d 580, 592-3

(2005); Hanley Co. Inc. v. Bradley, 259 N.Y.S. 278, 287-8 (1927).  Restoration of the specific assets received under the contract is not a necessary requirement.  Restitution of the reasonable value of the rights enjoyed by the breaching party is the more typical form of order.

Where there is a rescission, "in most cases the remedy of restitution means the restitution of money value and not the return of some specific thing received by the defendant."  12 Corbin on Contracts (Interim Ed.) §1107, p. 25, §1109, p. 31.  See 26 Williston on Contracts (4th Ed.) §68.3 p. 52.  The measure of recovery in such cases is the value of the consideration received by the defendant, not the contract price. 12 Corbin, op. cit. §1112, p. 44, §1113, p. 49.  E.g., Sterling Motor Truck Co. v. Schuchman, 260 N.Y. 358, 360 (1932).

"Restoration" poses no problem here.  Nor does any so-called "change of position" asserted by Paramount.  On rescission, Paramount would retain the three films it made.  Only its right to make new "Godfather" films would end.  The Estate would return the $50,000, and the Court would restore to the Puzo Estate the reasonable value of Paramount's use of the rights prior to the rescission.

The fact that Paramount held the rights for a long time before committing its breach and repudiation is no barrier to rescission.  If A agrees to pay B a fixed annual sum to use B's tractor, and, after a number of years, A stops paying, B can rescind, refuse to continue providing the tractor and recover the reasonable value of its prior use, which may be greater than the contract price.  The years prior to the breach do not prevent rescission.

Paramount's rescission cases (Par. Mem. p. 13) do not preclude that remedy on these facts.  Paramount cites cases denying rescission where the breach was neither willful and material nor one that goes to the essence of the contract and where damages were patently an adequate remedy.  Examples are Septembertide Publishing, B.V. v. Stein & Day, 884 F.2d 675 (2d Cir. 1989) [non-payment of "final installment"]; Maldonado v. Valsyn, 2009 WL 3094888 (S.D.N.Y. 2009) [No repudiation, and only partial payment missed]; Arthur Guinness & Sons PLC v. Sterling Publishing Co., 732 F.2d 1045 (2d Cir. 1984) [Preliminary injunction denied.  Breach was "honest disagreement concerning a relatively small sum."]; and Faden Bayes Corp. v. Ford Motor Co., 1997 WL 426100 (S.D.N.Y.) [breach was only 2% of contract price].

In other cases cited by Paramount, rescission was rejected because the party seeking the remedy had failed to plead rescission or to tender return of the consideration.  Examples are Ariel (UK) Ltd. v. Reuters Group PLC, 2006 WL 3161467 (S.D.N.Y. 2006); and Kamerman v. Curtis, 285 N.Y. 221 (1941).

But the Amended Counterclaims here do include a rescission count (albeit in the alternative), as well as an offer to return the payment received under the 1969 Agreement (Am. Counterclaims ¶¶ 21, 22, p. 18).  In addition, they allege that the breach was both "willful" and "material" and that it went to the essence of the contract.  They set out the facts showing this, as well as the reasons that damages are not an adequate remedy (Am. Counterclaims ¶¶ 13-15, pp. 12-16).

Paramount's cases may raise questions of fact, but there is nothing in them that could warrant dismissal of the Estate's alternative claim for rescission. And, in no event, would they call for dismissing the Estate's claim for cancellation.

## VI.   PARAMOUNT'S ACTS CONSTITUTED A REPUDIATION AND A BREACH.

Paramount's unequivocal disavowal of Puzo's right of book publication constituted a repudiation, as did its claim to contract rights it did not have. Disavowing a party's contract right is, in itself, a form of repudiation. "The primary goal of the doctrine of anticipatory repudiation is 'protecting an injured party's expectation of and reliance on receiving the promised performance. This expectation is impaired by the other's unequivocal disavowal of its obligation." 13 Corbin on Contracts (Rev. Ed.) §68.5(1)(b) p. 213 (emphasis added). A statement disavowing the party's rights under a contract is a repudiation of the agreement, even if the disavowing party believes in good faith that the other party does not have the rights that are disavowed. E.g., Record Club of America, Inc. v. United Artists Records, Inc., 643 F.Supp. 925, 939 (S.D.N.Y. 1986). See II Farnsworth on Contracts (3d Ed.) §8.21 p. 561 n.11.

The erroneous claim to a right not given by the contract is also an anticipatory repudiation that warrants termination of the contract. E.g., Morgan v. McCaffrey, 789 N.Y.S.2d 274, 276 (2005). And an untenable interpretation of a parties' contractual rights or duties can also be a repudiation. E.g., Hampton v. District Council, 411 N.Y.S.2d 124, 127 (1978). See, Palazzetti Import/Export, Inc. v. Morson, 2001

WL 1568317 (S.D.N.Y. 2001) ["unwarranted interpretation" of the contract can be a repudiation].

Paramount did all of these things.  It insisted on an untenable interpretation of the contract, it demanded rights it did not have, and it disavowed Puzo's essential contract rights.  Its doing so was unambiguous and unequivocal.  But, even if Paramount's statements had been doubtful or ambiguous, they would have been sufficient as a repudiation, because they were accompanied by an actual breach.  "Language that is accompanied by a breach by non-performance may amount to a repudiation even though, standing alone, it would not be sufficiently positive."  Restatement of Contracts 2d §250 Comment b, p. 273.

Here, the renunciation of Puzo's contract rights was accompanied by two different forms of actual breach by Paramount.  First, by directly threatening the publishers in order to impair and frustrate the Estate's exercise of its publishing rights, Paramount committed a breach of the implied covenant of good faith and fair dealing that is inherent in every contract.  See, e.g., The Kirke La Shelle Co. v. The Paul Armstrong Co., 263 N.Y. 79, 87 (1933) ["In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing."].

Moreover, Paramount refused to permit the Estate's exercise of its publishing rights unless the Estate agreed to escrow all of the money, imposing a condition to the free exercise of the Estate's rights that Paramount had no right to impose.  That too was a

breach.  A party that conditions its performance on an act or omission to which it is not

entitled commits a breach of its obligation to render that performance.  E.g., <u>Penthouse</u>

<u>Intern. v. Dominion Fed. Sav. & Loan</u>, 665 F.Supp. 301, 310 (S.D.N.Y. 1987).  See

10 <u>Corbin</u> Op. Cit. §973 p. 90 (citing cases).

  In any event, whether a statement is sufficient to constitute a repudiation is "a

question of fact."  13 <u>Corbin on Contracts</u> (Rev. Ed.) §68.1, p. 185.  The cases cited by

Paramount do not begin to support the argument that, as a matter of law, Paramount's

statements cannot qualify as a repudiation.  <u>Lovasz v. Fowler</u>, 207 N.Y.S. 871 (1924), is

a one paragraph opinion that, in the absence of an interpreter, the plaintiff's testimony,

was "so incoherent" that the court cannot determine whether there was a repudiation or

not.  <u>Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.</u>, 92 N.Y.2d 458

(1998), simply confirms that, under New York law, there is a right to demand assurances

of performance where performance is doubtful.  <u>Palazzetti Import/Export, Inc. v. Morson</u>,

2001 WL 1568317 (S.D.N.Y. 2001) at *9, actually supports the Counterclaim.  It upholds

a finding of anticipatory repudiation, stating that "an attempt to advance an unwarranted

interpretation of the contract" can be a repudiation.  In <u>RT Computer Graphic, Inc. v.</u>

<u>United States</u>, 44 Fed. Cl. 747 (1999), the court held that, to warrant rescission, the

injured party must elect to end the contract, rather than to keep it alive, and also that there

was no repudiation, because defendant never said anything inconsistent with the

agreement or the plaintiff's rights.  Here, of course, the Puzo Estate did elect to end the

contract, and Paramount said and did a number of things inconsistent with Puzo's rights.

## VII.   PARAMOUNT'S BREACH AND REPUDIATION WERE "MATERIAL."

Like the existence of a repudiation, the materiality of a breach or repudiation is a question of fact.  13 Corbin, Op. Cit. §68.4(1) p. 185.

The Amended Counterclaim does not simply assert that the breach and repudiation were material.  It sets out the facts showing their materiality.  Mario Puzo was a novelist, not a movie person.  He had written two well received novels before "The Godfather." He explained that "Books are my world," so that, in making his Paramount contracts, nothing was more important to him that Paramount could not publish books based on his characters from "The Godfather" or prevent him from doing so (Am. Counterclaims ¶ 14, pp. 15-16).  Other than the minimal payment made in 1969, this critical retention of book rights was the only thing Puzo got under the 1969 Agreement.  The many remaining provisions of Paramount's printed form contract are all for the benefit of Paramount. Thus, Paramount has repudiated the Estate's only continuing right.

Reserving book rights was "of the essence" to Puzo.  If Paramount had made its present claims at the time of the 1969 Agreement, Puzo would not have made that agreement (Am. Counterclaims ¶14, pp. 15-16).

Puzo's consistent stand on book publishing rights was communicated to Paramount and recognized by Paramount.  As a result, every one of the five contracts between them reserved book rights in Puzo; and every one of the three contracts for sequel films reserved book rights in Puzo – even though those sequels were commissioned and paid for by Paramount (Am. Counterclaim ¶¶3-6, pp. 8-10).

When, after Puzo's death, Paramount disavowed his critical contract rights, insisting to the Estate and to the publishers that neither the Estate nor the publishers could publish "The Family Corleone" and that Paramount owned all such rights, Paramount repudiated and interfered with Puzo's most important and essential right under the 1969 Agreement.

## VIII.  **PARAMOUNT INDUCED A BREACH BY THE PUBLISHERS.**

Based on Paramount's threats, the publishing companies were unwilling to perform their contracts except on the condition that the Estate obtain Paramount's consent.  To give that consent, Paramount demanded that the Estate escrow the funds to which it was entitled.  Thus, the publishers were willing to perform their contracts only if (1) Paramount consented and (2) the Puzo Estate agreed to escrow the money.  Both were conditions neither the Publishers nor Paramount was entitled to impose.  (Am. Counterclaims ¶ 13b, pp. 13-14).  Since the publishers had no right to condition their performance on these events, doing so was a breach on their part.  E.g., Penthouse Intern. v. Dominion Fed. Sav. & Loan, 665 F.Supp. 301, 310 (S.D.N.Y. 1987).  See 10 Corbin, Op. Cit. §973, p. 90.

Paramount induced that breach.  But for Paramount's claims, threats and demands, the book would have been published without these improper conditions (Am. Counterclaims ¶ 13b, pp. 13-14).

Paramount argues that its filing this lawsuit is privileged.  But Paramount's conduct that induced the publishers' breach was not filing this lawsuit.  It was directly communicating its threats and demands to the publishers.

Finally, Paramount argues that an "Interim Settlement Agreement" – not properly a part of the record on a motion to dismiss – waived the Estate's right to sue Paramount for inducing breach.  That agreement did nothing of the kind.  The Estate was forced to agree to escrow the funds in order to permit the publishers perform their contracts.  It was, by no means, waiving its claim that Paramount's demanding such an agreement was a breach by Paramount and a breach by the publishers induced by Paramount.  The "Interim Settlement Agreement" makes this clear, expressly providing that its terms "shall not waive or affect any of the rights, remedies, or claims of any Party (including, *inter alia*, claims for damages, declaratory relief, cancellation, and termination)."

## IX.  <u>THE COUNTERCLAIMS ARE NOT PREEMPTED BY THE COPYRIGHT ACT.</u>

Paramount's original motion to dismiss did not raise the issue of preemption.  Its new argument is unavailing.  Section 301 of the Copyright Act preempts certain state law claims – essentially claims that allege nothing more than the equivalent of copyright infringement.  Preemption applies only where the claim meets both the "subject matter requirement" and the "general scope requirement."  <u>Briarpatch Ltd. v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 305 (2d. Cir. 2004).  Two things are essential to meeting the "general scope requirement," without which there can be no preemption: "(1) 'the state law claim must involve acts of reproduction, adaptation, performance, distribution or display,'" "*and* (2)" the claim "must not allege any 'extra elements' that make it qualitatively different from a copyright infringement claim."  <u>Canal + Image UK Ltd.  v. Lutvak,</u>

773 F.Supp.2d 415, 441 (S.D.N.Y. 2011), quoting the Second Circuit in Briarpatch, supra, 373 F.3d at 305 (emphasis added).

According to Briarpatch and Canal +, unless both requirements are met, there can be no preemption.  An act of "reproduction, adaptation, performance, distribution or display" must be alleged, "and," "further," there must be no "extra element."  See Briarpatch at 305; Canal + at 441.  Neither requirement is met here.

For example, where no act of infringement is alleged, a suit to cancel or rescind a copyright license agreement for material breach of contract is not preempted.  E.g., Scholastic Entertainment, Inc. v. Fox Entertainment Group, Inc., 336 F.3d 982, 989-9 (9th Cir. 2003) ["Scholastic's success in terminating the agreement is a pure question of state contract law appropriate for adjudication in the California courts"].  3 Nimmer, On Copyrights § 12.01[A][2] p. 12-35 ["In an action for rescission of a contract involving copyrights, the state courts have jurisdiction"].  See Graham v. James, 144 F.3d 229, 237 (2d Cir. 1998) ["material breach of copyright licensing agreement gives rise to a right of rescission."  No indication claim preempted].

As in Scholastic, the Puzo Estate's suit for cancellation does not allege any act of "reproduction, adaptation, performance, distribution or display."  See 17 U.S.C.A. §106. What is alleged is only the making of an adverse claim, conduct not precluded by the Act. "Infringement, as used in the copyright law does not include everything that may impair the value of the copyright."  T.B. Harms Co. V. Eliscu, 339 F.2d 823, 825 (2d Cir. 1964), cert. den. 381 U.S. 915 (1965).  It does not include asserting a claim denying another party's ownership.

The Copyright Act protects against infringing acts and provides remedies for their commission. But, making an adverse claim to a copyrighted work is not an act of infringement. The distinction between commission of an act precluded by federal statute and the assertion of an adverse claim to a federally protected right was recognized long ago by Justice Holmes in <u>American Well Works v. Layne & Bowler Co.</u>, 241 U.S. 257, 259-60, 60 L.Ed. 987, 989-9 (1916) [false claim to ownership of a patent is a state, not federal matter].

Thus, the first requirement for preemption under the Second Circuit's test is missing – there is no allegation of an act that is the equivalent of copyright infringement. That, in itself, eliminates preemption. But the second requirement is also missing. There are "extra elements."

This is a contract dispute. Determining whether the Estate has book publishing rights depends on the meaning of the contract, not construction of the Copyright Act. Numerous authorities hold that the existence of a contract between the parties is, in itself, an "extra element," since their having a contract is not required for copyright infringement. Under these cases, the Act does not preempt contract disputes, even regarding copyrighted material.

"Contract law is a good example of a state law that will be immune from preemption under the extra element test. Contract law may be employed to prohibit the unauthorized reproduction, distribution, performance or display of a work. But, in addition to those acts, contract law requires the plaintiff to prove the execution of a bargained for exchange – something it need not prove in a cause of action for copyright

infringement." Goldstein, On Copyright, §17.2.1, p. 17:12.[2]

This rationale has been adopted in numerous cases rejecting preemption of contract based claims. Torah Soft Ltd. v. Drosnin, 224 F.Supp.2d 704, 716-17 (S.D.N.Y. 2002) ["The 'extra element' that saves a contract claim from preemption is the promise itself"]; Architectronics, Inc. v. Control Systems, Inc., 935 F.Supp. 425, 438-41 (S.D.N.Y. 1996); Brignoli v. Balch Hardy & Scheinman, Inc., 645 F.Supp. 1201, 1204-06 (S.D.N.Y. 1986).

An analysis of policy interests also supports this line of cases. The states have a significant interest in construing, enforcing and deciding if and when to terminate the contracts of their citizens. That state interest is quite different from the federal government's interest in protecting copyrights from infringement.

Rather than finding an "extra element" in all contract disputes, some cases undertake a factual analysis to determine if, despite its label, the claim is really one that is the equivalent of copyright infringement. E.g., Wolff v. Institute of Electrical & Electronic Engineers, Inc., 768 F.Supp. 66 (S.D.N.Y. 1991). If the alleged promise was simply not to commit the infringing act, and the alleged breach is simply the commission of that act, these cases hold that the contract is not really an "extra element" and find preemption.

As Judge Sands summarized the cases, however, "the greater weight of the

---

[2]  As Professor Goldstein also points out, "The House Report on the 1976 Copyright Act says that nothing in Section 301 'derogates from the rights of parties to contract with each other and to sue for breaches of contract." Goldstein, On Copyright, §17.9.1.1, p. 17:73 [quoting House Report No. 94-1476 2d Sess., p. 132].

authority indicates that breach of contract actions are generally found not to be preempted by the Copyright Act." Lennon v. Seaman, 63 F.Supp.2d 428, 437 (S.D.N.Y. 1999).

But, this Court need not decide which approach to follow. The Estate's claims are not preempted under either approach. There is no allegation of any act of "reproduction, adaptation, performance, distribution or display," and this, in itself, eliminates preemption. In addition, there are "extra elements." Even under the "factual analysis" cases, the contract here is an "extra element," since the breach and repudiation are not merely acts that are the equivalent of infringement under a different label. And, there are other "extra elements." Paramount's making an adverse claim is an "extra element" not required for an infringement action. A defendant can infringe the plaintiff's copyright without asserting any adverse claim. And, Paramount's threatening the publishers to prevent or hamper the Estate's exercise of its contract rights is still another "extra element" not required for an infringement claim. A defendant can infringe the plaintiff's work by copying it, without doing anything to impede the plaintiff's own use of that work.

Thus, neither of the two "general scope" requirements essential to preemption has been satisfied. There is no allegation of any act that constitutes the equivalent of infringement, and there are "extra elements" beyond those required for an infringement action.

There is still another way of demonstrating that this action is not preempted. When the Copyright Act preempts a state law claim, "any claim purportedly based on the preempted state law is considered, from its inception, a federal claim, and therefore arises

under federal law." Firoozye v. EarthLink Network, 153 F.Supp.2d 1115, 1120 (N.D. Cal. 2001). See Briarpatch, supra, 373 F.3d at 304.  Since every claim preempted by the Copyright Act is, "from its inception," a claim that "arises under federal law," it follows that a claim that does not "arise under federal law" is not a claim preempted by the Act.

The leading case of T.B. Harms Co. v. Eliscu, supra, 339 F.2d 823, 825, 828 (2d Cir. 1964), cert. den. 381 U.S. 915 (1965), established the rule that, where there is no allegation of copyright infringement, contract disputes over ownership of intellectual property rights do not "arise under" the Copyright Act and belong in the state courts.

Numerous cases have followed this rule.  E.g., Rotardier v. Entertainment Co. Music Group, 518 F.Supp. 919, 920-21 (S.D.N.Y. 1981) ["The controlling issue involves a dispute over title to a copyright arising from an alleged breach of contract.  The determination of this issue is dependent upon principles of common law and equity, not the federal copyright laws"]; See, Affymax Inc. v. Ortho-McNeil-Janssen Pharmaceuticals, Inc., 660 F.3d 281, 284 (7th Cir. 2011) ["Judge Friendly's famous opinion in T.B. Harms v. Eliscu [citation], holds that controversies about contracts that allocate ownership of copyrights arise under the contract, not the copyright laws"]; Nova Design Build, Inc. v. Grace Hotels, LLC, 652 F.3d 814, 816 (7th Cir. 2011) [In T.B. Harms ". . . . the dispute was about who owned the copyright (id. at 824).  The plaintiff was not asserting any claim of infringement and thus was not seeking any relief provided by the Copyright Act"].

The preemption cases cited by Paramount are unavailing.  Unlike our case, Paramount's cases involve the allegation of an act equivalent to copyright infringement.

Sometimes the claim is given another label, such as "unjust enrichment" or "unfair competition." But the claim is still the equivalent of infringement. These cases stand for the proposition that, if the claim is based on such an act, the label on the claim doesn't matter.

For example, in WNET v. Aereo, Inc., 2012 WL 1850911 (S.D.N.Y.), the plaintiff alleged acts of copyright infringement, plus a claim for unfair competition based on private performance of the material. There was no claim of an extra element, and there was no contract and no contract dispute. The unfair competition claim was held preempted as based on the equivalent of an infringing act. In our case no such act is alleged, there is a contract and a contract dispute and there are "extra elements."

Santa-Rosa v. Combo Records, 471 F.3d 224, 227 (1st Cir. 2006), also involved a claimed act of copyright infringement and breach of a recording contract. Co-authorship of the musical recordings required construction of the Copyright Act to determine who owned the records on rescission of the contract. Given that necessity, the First Circuit held the claim preempted. In our case, there is no claim of infringement, and either cancellation or rescission would end Paramount's right to make more Godfather films, without affecting its ownership of the three Godfather films previously made. There would be no need to construe the Copyright Act to determine anyone's rights.

Paramount's other cases, Am. Movie Classics Co. v. Turner Entm't Co., 922 F.Supp. 926, 931 (S.D.N.Y. 1996); Wolff, supra, 768 F.Supp. at 69; Price v. Fox Entm't Group, Inc., 473 F.Supp.2d 446, 460-61 (S.D.N.Y. 2007); Cooper v. Sony Records Int'l, 2001 WL 1223492 (S.D.N.Y. 2001) and Titan Sports, Inc. v. Turner Broad.

Sys., Inc., 981 F.Supp. 65, 74 (D. Conn. 1997), hold that claims based on an act that is the equivalent of infringement are preempted, regardless of the label. They are inapposite here, where no such act is alleged and "extra elements" are present.

## X.    **CONCLUSION**.

At best, Paramount has raised questions of fact as to whether a material breach and repudiation have been alleged. There can be no dismissal based on these issues; and there can be no preemption. This is a dispute as to the meaning of a contract, with no allegation of an act of "reproduction, adaptation, performance, distribution or display" and with "extra elements" not required for an infringement action. The motion to dismiss should be denied.

Dated: July ▲ 2012
      Los Angeles, California

Bertram Fields
GREENBERG GLUSKER FIELDS
  CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA  90067
P:     310.553.3610
F:     310.553.0687
bfields@ggfirm.com
     and
David Boies
Motty Shulman
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, N.Y.  10504
P:    914.749.8200
F:    914.749.8300
dboies@bsfllp.com
mshulman@bsfllp.com

By: _____
    Bertram Fields
    *Attorneys for Anthony Puzo, as Executor*
    *of the Estate of Mario Puzo*